WASHINGTON B. WILLIAMS, receiver &c.,

*v.*

PATRICK RILEY.

The treasurer of a savings bank, who was also one of its managers, assigned to the bank a bond and mortgage owned by him on lands not worth double the mortgage, as required by the bank's charter, and without submitting the investment to the finance committee for approval, as required by its by-laws.— *Held,* that he was liable for a loss sustained on such bond and mortgage, and that the fact that the managers did not object to or repudiate the transaction for six years, was no defence, whether his breach of duty was known or not known by the other managers.

---

Bill for relief. On final hearing on pleadings (original bill, answer and replication), and proofs and supplemental bill and general demurrer thereto.

*Mr. W. B. Williams, in pro. pers.*

*Mr. P. Bentley,* for defendant.

Williams v. Riley.

THE CHANCELLOR.

This is a suit brought by the receiver of the Mechanics and Laborers Savings Bank (of Jersey City) against one of the managers, to compel him to indemnify the depositors and other creditors of the bank against the loss which it has sustained upon a bond and mortgage for $3,000 assigned by him to the bank in May, 1873. At that time he was one of the managers, and was treasurer also. He continued to be treasurer until November, 1877, and was a manager down to the time when the bank was declared by this court to be insolvent, and a receiver appointed, which was in March, 1879. The mortgage was dated December 9th, 1869, and was payable in one year, with interest. No part of the principal was at any time paid, and none has been collected, except through the sale of the mortgaged premises in a suit for foreclosure brought by the bank in this court before the receiver was appointed. The foreclosure sale took place July 17th, 1879, after the appointment of the receiver. The property sold for $1,000. After paying execution fees, there remained $944.28, applicable to the amount due for principal and interest ($3,614.28) on the mortgage, costs of suit ($78.09), and money paid ($17.60) for insurance premiums by the bank on the property—altogether, $3,709.97. So that a balance of $2,765.69 was due to the bank on the day of sale, and it still remains due, with interest from that time. For that sum (which is the amount of the loss sustained by the bank), with interest, the complainant asks a decree. The ground of his claim is that the transaction in question was a breach of duty, a violation of trust on the part of the defendant, for which he is bound to answer to those whom the receiver represents. By the charter of the bank (P. L. of 1869 p. 179), it is provided that the bank shall invest no money in any public stocks other than those specified, nor on bond and mortgage, except on real estate worth at least double the amount of the sum invested above all encumbrances, nor in the stock of any incorporated company whatever. The by-laws of the corporation provide (and did when the transaction under consideration took place) for the appointment of a finance committee of three managers, besides the president and vice-

Williams v. Riley.

president, who were *ex officio* members, whose duty it was to attend to all applications for loans. They also provided that all checks should be drawn by the treasurer and countersigned by the president, or, in his absence, by the vice-president, and should be made payable to the person in whose favor they were given, and that no payment of over $25 should be made, except by check. At the time of the transaction in question, there was a finance committee, but the propriety of making the investment was not submitted to it, and it never passed upon it.

That the investment was one which was forbidden by the charter, appears very clearly from the testimony of the defendant himself. The mortgaged premises were a house and lot in Jersey City. The defendant owned them on the 9th of December, 1869. On that day he conveyed them to the mortgagor, Christopher Conolly, for the consideration of $5,000, of which $2,000 were paid in cash, and the rest secured by the mortgage. The investment would not have been an allowable one under the charter, unless the premises were, at the time of making it, worth $6,000, the mortgage being for $3,000. It is quite manifest that they were not worth more than the price which the defendant got for them. He bought the lot in 1869 for $1,200. He removed the house, which was then about nine or ten years' old, at least, from another place to the lot. He says it cost him between $3,300 and $3,500. The property, therefore, according to its cost, as he states it, was not worth over from $4,500 to $4,700 in 1869. He does not say what it was worth when he assigned the mortgage in 1873. According to the judgment of the other witnesses, it was then worth not more than from $3,500 to $4,000. There was a fall in the price of property between 1869 and 1873, and the depreciation continued and increased for several years. The defendant willfully disregarded the regulations made by the board of managers for the security of the depositors, by which it was, in effect, provided that no investment should be made unless approved by the finance committee, and that all applications for investment of the funds should be made to them alone. With full knowledge that the investment not only had not been duly authorized, but was one forbidden by

the charter, he, with the concurrence of the president, indeed, but, nevertheless, in violation of his duty and trust, as it was in violation of the duty and trust of the president, took from the funds of the bank, by check drawn by himself as treasurer, the amount of the bond and mortgage on the assignment of those instruments to the bank. Nor can he shelter himself under the suggestion that though he was a manager and officer he is to be regarded as standing in the relation of a stranger to the bank in this transaction. He was a trustee, and, as such, bound to protect the interests of his *cestuis que trust*. That obligation involved a strict adherence to the provisions of the charter and the regulations of the bank designed for their protection. He would not have been at liberty to disregard them if the application had come from a stranger; on what principle can he be justified in disregarding them in his own dealings with the bank? Had a stranger sought to obtain from the bank the money for the bond and mortgage, it would have been the duty of the defendant, if the matter came to his knowledge in time, to object to it, and if his objection had been unheeded, it would have then been incumbent on him to do what he could to prevent the illegal transaction. *Crane* v. *Hearn, 11 C. E. Gr. 378.* Manifestly, he is without excuse now. He has been guilty of a misapplication, at least, of the funds of the bank. And where there has been a waste or misapplication of the funds of a corporation by an officer or agent of the corporation, suit may be brought in equity, in the name of the company, to compel him to account for such waste or misapplication, or breach of trust. *Citizens Loan Assn.* v. *Lyon, 2 Stew. Eq. 110; S. C. affirmed on appeal, 3 Stew. Eq. 732.* Here the misapplication was by one who was not only an officer of the institution, but a trustee also. *Atty.-Gen.* v. *Mech. & Lab. Sav. Bk., 5 Stew. Eq. 163; Hannon* v. *Williams, 7 Stew. Eq. 255.* And he is bound to indemnify his *cestuis que trust*, and the receiver may maintain suit against him to obtain the indemnity. The receiver of an insolvent corporation takes all the rights of action which the corporation itself had, and may enforce them by the same legal remedies. *High on Rec.* § *316; Wilson's Exr.* v. *Rec. N. J. Mut. L. Ins. Co.*, 14

26

*Vr.* The defendant urges, in his defence, that it was incumbent on the corporation to repudiate the transaction, if it was objectionable, within a reasonable time, and that its failure to do so for the period which elapsed between the time when it took place, May, 1873, and the decree of insolvency, March, 1879, nearly six years, is a bar, in equity, to any recovery against him. But there is no evidence that his co-trustees, not even the president himself, by whose co-operation he was enabled to obtain the money, were ever aware of the illegality of the transaction ; that any of them ever knew that the mortgage was such, by reason of the inadequacy of the mortgaged premises to answer the requirements of the charter, as the institution had no right to take, as an investment of the trust funds confided to its care. By the custom of the bank, its mortgages and other securities were placed and remained in the custody, or subject to the control, of the president, and the mortgage in question, when it was assigned, was delivered by the defendant into the charge of the president and secretary, in the usual way, and remained there as part of the assets of the institution. The president, with the knowledge and consent of the defendant, unlawfully usurped the province of the finance committee in making the investment, and from the time when the investment was made, had the custody or control of the mortgage. He does not appear to have made any inquiry whatever as to the value of the property, or to have had any knowledge or information on the subject. It not only does not appear that any of the other managers had any knowledge or information on the subject, but it is a fair inference, from the evidence, that they knew nothing of the merits or demerits of the transaction. But had it been otherwise, the fact would not have availed the defendant as a defence to the claim now made against him. The countenance of his co-trustees in his breach of his trust would not have excused him from liability for it. Soon after the receiver was appointed he discovered, on investigation, the character of the transaction, and he then tendered to the defendant the bond and mortgage (the latter was then in course of foreclosure), with a re-assignment thereof to him, and demanded of him the $3,000, and so much of the in-

terest as had not been collected by the bank upon them. The defendant refused to receive them and pay the money. The receiver appears to have acted promptly. There will be a decree that the defendant pay the receiver the sum of $2,765.69 before mentioned, the balance which, on the 17th of July, 1879, remained due on the investment, after applying the proceeds of the sheriff's sale, with interest thereon from that date, and the costs of this suit.

The supplemental bill sets up the proceedings in the foreclosure suit after the filing of the original bill; that notice was given by the complainant to the defendant of the sale under the execution in that suit, to the end that he might protect himself, and the sale by the sheriff and the purchase of the property by the defendant thereat &c. The demurrer to that bill will be overruled, with costs.